Caruthers, J.,
delivered the opinion of the Court.
The plaintiff moved the Circuit Court of Bedford for judgment against the defendant, upon the ground that he was his surety in, and had paid off a judgment on the following note:
“ $774. Rowesville, Tern., August 9, 1854.
“Four months after date, we, or either of us, promise to pay Jas. W. Johnson, or order, at the Branch of the Bank of Tennessee, at Shelbyville, seven hundred and seventy-four dollars, for value received. Witness our hands and seals, date above.
S. K. WHITSON, [seal.]
J. B. BATES, [seal.]
Endorsed by Johnson, Knight, Stamps, and Elliot.
■ The bank sued the makers and endorsers, and Bates paid the judgment.
The Court submitted the question of suretyship to the jury., and they found the issue against Bates. The errors assigned are upon the charge of the Court. These will be better understood by a brief statement of the facts.
In the fall of 1853, Trigg and Bates were partners in buying and driving hogs to the South. Part of the funds employed by them in this business was raised by a bill of exchange upon Mobile for $3,500, drawn by them, and endorsed by the same men, perhaps, who endorsed this note, and discounted by the bank An amount sufficient to pay off this bill was retained out of the proceeds of the drove, and placed in the hands of Trigg, for that purpose. He paid all but the above *157 balance, which he applied to his own debts, and left that unpaid. He gave assurances to the bank that he would soon discharge it, but- died before it was done; and Whitson became his administrator. He applied to the bank for a further extension of the time, and the same was given by 'discounting the above note. The estate of Trigg was then thought to be good, but it turned out otherwise in the end; and the struggle now is upon whom the loss shall fall. This depends upon the issue submitted to the jury.
There is no controversy but the proceeds of this note were applied to the extinguishment of the balance due upon the bill of exchange of Trigg and Bates. But the question is raised upon the- ground that Whitson, though not bound, when he became administrator of Trigg, in view of the fact that his intestate should have paid the debt, and considering the estate entirely solvent, made it his own debt, and procured Bates - to become joint maker of the noté in the character of surety, as between themselves, in order to obtain the same endorsers, and to satisfy the demand of the bank to have the same men on the note that they had on the bill of exchange; or, as appears by the proof of Johnson, one of the endorsers, that when the note was presented to him first to endorse, Whitson alone was maker, and he refused to endorse it unless Bates, who was bound before him on the bill as one of the drawers, or some other good man, would become joint maker of the note, after which it was returned with Bates’ name, and he endorsed it. This application, first and last, was not by Whitson, but a man named Jett, who was joint administrator of Trigg.
*158 After the note fell due, and was protested and sued upon, Whitson told Bates he did not intend for him to pay the note, or any part of it; that he should never pay “ one dime of it,” as he had become hound on it at ’ his (Whitson’s) request, and for his accommodation, to get the endorsers upon it. It appears further, that after the judgment and execution, upon application to Whitson for the money, he said he did not have the money of his own, or of the estate, but told the officer to request Bates to “advance the money for him, and he should be repaid out of or in the first note of the witness and Bates that fell due for the land and mill of Wm. II. Trigg, the intestate, which had been- sold to pay debts.” The witness advanced the money at the request of Bates, who has since refunded to him.
Upon these facts the Court charged, in effect, that the question of suretyship depended not upon the form, but the substance of the transaction. That if the money to be raised on the note was intended to be, and was applied to the payment of a debt for which Bates and not Whiston was bound, he would not be the surety of Whiston; and the fact that Bates had placed the money in the hands of Trigg, to pay the bill, would make no difference, as that would only be a question between the partners in their settlement. He further charged that if the debt was Bates’ for which this money was raised, the understanding of the parties as to the relation they would occupy on the note, would not change the question; but that, from the fact that the note was made to pay a debt for which Bates was bound, and Whitson not, the law would fix the character of their relation, and Bates would be the principal, and not surety.
*159 The Court was requested to charge that the parties might by contract change this relation, even if the money was used in discharge of Bates’ debt; but this was refused. Whether the Court considered the proposition unsound in law, or not applicable to the facts of the case, and, therefore, a mere abstraction, does not appear. If the facts do not raise the question propounded, it was right to refuse to so instruct the jury even if such was the law. Indeed it would have been improper, though not error, to have done so. But it was, perhaps, declined upon the other ground, that the Court considered it not to be the law. Although there is no express contract or agreement to that effect, yet there is, perhaps, proof enough tending to establish that as the understanding of the parties to make it a proper question for the jury. So the questions made by the instructions ashed is properly before us for decision. We are not aware of any authority on the exact point, but we think it presents no serious difficulty upon principle. It would seem to be a great absurdity to hold, that in an obligation incurred by two' to raise money to discharge the debt of one, the other, who was in no way bound for the original debt, should become the principal, and the other, whose debt was paid, or for whose use and benefit the money was appropriated, should be surety. In such a case there would be no consideration for the agreement. There might be cases where such a contract would be enforced, but the facts would have to be very different from these.
Here was no consideration whatever. Whitson was in no way bound, in his individual capacity, for the debt to be paid or renewed by this note. All that he said and *160 did in relation to the payment of it, was upon the idea that the estate of Trigg was good, and in that event he knew it was just that it should he paid by him, as representative of Trigg, who had used the firm money intrusted to him for that purpose, and he honestly intended that should he done, and Bates saved. But there is nothing to show that he ever intended to pay it out of his own means, without a certain prospect of reimbursement out of the assets. As soon as he ascertained that the estate would, prove insolvent, he declined to take the loss upon himself for the exoneration of one of the original debtors. But then, if such had been his purpose, and he declined to execute a contract to that effect, our decision goes to the extent that he could not be compelled to do so without some consideration to sustain the promise.
This does not, of course, affect the question of the liability of the estate of Trigg, in the hands of Whitson, to Bates, for this debt, in the settlement of the partnership.
Let the judgment be affirmed.